# UNITED STATES DISTRICT COURT
## SOUTH DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

Alexhandyra Smith, individually and on behalf of all others similarly situated,

     Plaintiff,

     - against -

Sazerac Company, Inc.,

     Defendant

Class Action Complaint

Jury Trial Demanded

Plaintiff, Alexhandyra Smith ("Plaintiff"), by and through her attorneys, brings this action on behalf of herself and all others similarly situated against Defendant Sazerac Company, Inc. ("Defendant"). Plaintiff hereby alleges, on information and belief, except for information based on personal knowledge, which allegations are likely to have evidentiary support after further investigation and discovery, as follows:

## FACTUAL ALLEGATIONS

1.    Around 2018, journalists in Virginia and the Carolinas noticed what appeared to be hard liquor in places other than state-licensed Alcohol Beverage

Control ("ABC") stores.[1]





2.    These displays "at one local gas station showcase[d] names like Hobble Creek, Stroyski, Flash Point [Cinnamon] [Vera Cruz and Caribe Bay] … [] names one would typically associate with bourbon, vodka, [] Fireball [tequila and rum]."

---

[1] Benjamin Briscoe, That's Not Liquor At The Gas Station But it sure does look like it!, WFMY News 2, July 11, 2018 (Greensboro, North Carolina); Audrey Biesk, Fake Booze: Convenience stores start stocking shelves with faux liquor, WMBF News, May 9, 2018 (Horry County, South Carolina); Ned Oliver, How a major distiller slipped liquor look-a-likes into Virginia convenience stores, Virginia Mercury, March 4, 2019 (Richmond, Virginia).



3.      The reporters noted that residents "had questions [] when bottles that look an awful lot like whiskey, vodka and rum popped up at a 7-Eleven [and other convenience stores]," because "[they] would expect to see those mini-bottles [only] at ABC liquor stores."

4.      One Virginian tweeted, "ummm I'm not trying to narc but uhhhh what is this liquor display in a convenience store in VIRGINIA, did I miss something?!?!"

> ummm I'm not trying to narc but uhhhh what is this liquor display in a convenience store in VIRGINIA, did I miss something?!?! pic.twitter.com/TQsaNwisLY
>
> — taber (@taber) February 25, 2019

5.      A convenience store owner commented that "Everybody who comes over here is surprised. 'Oh, you guys start selling liquor?' I say, well, this is not liquor it's wine."[2]

6.      According to one customer, "It could have you fooled, I guess. You know what I'm saying? Because it looks like you got it out of the ABC store somewhere."

7.      Other customers commented that "[T]he branding is clearly intended to evoke the products they mimic without using words like whiskey or vodka," with Hobble Creek labeled as "traditional, blended, special select" and Stroyski as "Russian Style Premium."

 

8.      Even leading online sellers of alcohol were confused by Flash Point

---

[2] Jake Burns, Wine-based liquor look-a-likes hit shelves of Virginia convenience stores, WTVR CBS 6 News Richmond, March 04, 2019.

Cinnamon, with Total Wine describing it as an "American Whiskey" "perfect for sipping [and] shooting" that was also a "Wine based product."

**Product Information**

USA- Open up a bottle, find your flash point, and let it burn. With the taste of sweet cinnamon, Flash Point is perfect for sipping, shooting, and most of all sharing. Perfect in any cocktail. Wine based product that looks, smells, and mixes like a spirit.

| | |
|---|---|
| BRAND | Flash Point |
| COUNTRY | United States |
| STATE | Kentucky |
| SPIRITS TYPE | American Whiskey |
| ABV | 16% |
| SKU | 191042100-1 |

9.      Others purchased Flash Point Cinnamon and "had not even thought about it being something other than a whiskey, figure[ing] it was just a cheap [k]nock-off of fireball [whiskey], and yes was bought from a gas station, didn't think about that part ... Really should have looked it over more, this stuff is a huge disappointment when you are looking for a cinnamon whiskey kick."



**Will** says:

February 22, 2020 at 10:34 pm

i had not even thought about it being something other than a whiskey, figured it was just a cheap knock-off of fireball, and yes was bought from a gas station, didn't think about that part. Been a few years since I had cinnamon whiskey when i saw the bottle i thought… that just sounds right for tonight and had the clerk grab one for me. Really should have looked it over more, this stuff is a huge disappointment when you are looking for a cinnamon whiskey kick. It has the smell, has a cinnamon taste, but there is just no … great ball of fire traversing your neck and setting your stomach on fire.

10.      This "new line of products" was designed to "look and taste like liquor" "specifically for states [] with strict regulations on where and how liquor can be

sold," based on alcohol by volume ("ABV") and proof.

11.   The result is that they can "be sold in convenience stores and gas stations," seven days a week and twenty-four hours per day, in contrast to the more limited hours of a liquor store.

12.   These "pseudo-spirits" are "made by heavily filtering and then flavoring [and coloring] a wine base."

13.   Little information was publicly available about the manufacturer of these products, Brookstone Distillery Company, even though none of these products were distilled.

14.   Fast forward two years and the same questions asked by those in Virginia and the Carolinas were asked in New York.

15.   Not far from this Court in Poughkeepsie, radio host CJ McIntyre of 101.5 WPDH, "the home of rock and roll in the Hudson Valley," was shocked to see "a huge Fireball display in front of the cash register" at a gas station convenience store.[3]

---

[3] CJ McIntyre, Since When Can You Buy Fireball at Gas Stations in the Hudson Valley?, 101.5 WDPH, Hudson Valley Country, May 14, 2021



16.   Similar to the reaction in Virginia and the Carolinas, McIntyre remarked that "[he] thought [Fireball] was something you could only buy at a liquor store, right? I mean it's cinnamon flavored whiskey!!"

17.   He wondered if "this specific store [was] doing something they're not supposed to be doing?"

18.   Up in the Capital Region, Q105.7's Steve King reported a similar experience, when he "stopped for gas at my local convenient store and went in to grab a cup of coffee," "surprised by a new countertop display next to the cash register … little bottles of Fireball."[4]

---

[4] Steve King, Wait? Can You Buy Fireball at Gas Stations & Grocery Stores Now?, Q105.7 WQBK-FM, April 9, 2021.

 

19.   Incredulous, King "asked the cashier behind the counter, 'You carry Fireball now?' she said, 'Yeah, I guess.'"

20.   King "thought it was weird seeing Fireball for sale in the gas station since [he] thought liquor could only be sold in liquor stores in New York," until he learned from the Albany Times Union "that wasn't Fireball Cinnamon Whisky (left) [] at the gas station/convenience store. Nope, it was Fireball Cinnamon (right)."

 

21.    Senior Writer and Arts Editor Steve Barnes wrote how "[A] friend who peddles booze for a living dropped me a note describing upset among his client liquor stores because customers think Fireball Cinnamon Whisky is being sold in supermarkets in small bottles for 99 cents."[5]

22.    Liquor stores reported a decline in sales of Fireball cinnamon whisky, confirmed by their customers who told them they preferred to purchase it for lower prices elsewhere.

23.    Barnes shared "a photo posted on a local alcohol-focused Facebook group that asked, 'How can ShopRite [a supermarket] sell (this)???'"

---

[5] Steve Barnes, Liquor stores heated up over sneaky Fireball move, Table Hopping Blog, Albany Times Union, April 8, 2021.



24.    Barnes addressed "How the hell is this stuff now in supermarkets and gas stations?," and it is "[B]ecause it's not actual Fireball Cinnamon Whisky. It's a malt-beverage version called simply Fireball Cinnamon."

25.    Unlike Fireball Whisky, a distilled spirit, Fireball Cinnamon is a malt beverage based on fermentation to create a neutral base to which flavors and colors are added ("Flavored Malt Beverage" or "FMB").

26.    Fireball Cinnamon "clocks in at 33 proof, or 16.5 percent [ABV] [while] Fireball Cinnamon Whisky is [] 66 proof [and 33 percent ABV]."

27.    According to Barnes, "The labels look almost identical [and] [T]hat is intentional," but if consumers "look closer [they] will see [one is] actually called simply" "'Fireball Cinnamon (notice there's no Whisky after the word Cinnamon)," flavored to taste like cinnamon whisky.

 

28. Barnes explained that though in general, distilled spirits are technically sold in liquor stores, "Trying to make sense of the complexities of which stores can sell what becomes an exercise in foundering in the State Liquor Authority website, which I recommend only for frustration masochists."

29. The "distinctions are largely based on ingredients and how a beverage is made, and in some instance on the percentage of alcohol by volume."

30. For "liquor, liqueur, spirit or is distilled, it may be sold only in a liquor store in New York state, but liquor stores can't sell malt-liquor products or beer. Which means wine/liquor stores can sell cider, mead and wine products, as can supermarkets. However, wine/liquor are off-limits in grocery/drug/convenience stores, and beer and malt liquor are verboten in wine/liquor retailers. Got that?"

31. Barnes did not mention that FMB's can obtain a significant amount of their alcohol content from "added flavoring" from distilled spirits, a loophole in the relevant regulations.

32. The Product is now also sold throughout Florida.

33.   Interestingly, the same company which introduced the "fake liquor" in the Virginias and Carolinas is responsible for Fireball Cinnamon (the "Product"), because Brookstone is a subsidiary of Sazerac Company, Inc. ("Defendant").

34.   While federal and identical state regulations allow the cinnamon version to use the distilled spirit brand name of Fireball, they prohibit the overall misleading impression that it is identical to the whisky version.

35.   According to information disclosed before the Trademark Trials and Appeals Board ("TTAB"), "fireball" is the name, or part of the name, of a number of cocktails, shots and shooters, most of which include whisky or liqueur(s) as ingredients.

36.   The name has become part of the lexicon of alcoholic beverages in the same way martinis and margaritas indicate the presence of gin and tequila.

37.   The sale of distilled spirits in small bottles, referred to as "minis" or "nips," is common and known to most Americans due to their abundance on the side of most roads or from being available on airplanes.

38.   Until a few years ago, no consumers would have seen non-distilled spirits sold in mini bottles.

39.   The concept of bottling non-distilled spirits in a mini bottle is deceptive, because purchasers of small bottles of alcohol expect what they are buying is potent and high in proof, like the Fireball Whisky, bottled at 33% alcohol by volume ("ABV") or 66 proof.

40.   Purchasers of mini bottles of alcohol are not expecting that what they

are buying will be half as strong, as the Fireball Cinnamon is 16.5% ABV and 33 proof.

41.   "Fireball" is not qualified with the word "brand," which could alert purchasers what they are buying has little connection to cinnamon whisky.

42.   Even the Fireball Cinnamon's statement of composition, in the smallest allowed size, draws particular attention to the apparent use of the distilled spirit of whisky, stating "Malt Beverage With Natural Whisky & Other Flavors and Carmel Color."



43.   Using the words "With Natural Whisky & Other Flavors" is a clever turn of phrase because consumers who strain to read this will see how "Natural Whisky" is on a separate line and apparently unconnected to the "Other Flavors."

44.   Should purchasers look very closely and see "Malt Beverage," they will think it is combined with "Natural Whisky," like Fireball Whisky.

45.   What the label means to say is that the Product contains "Natural

Whisky Flavors & Other Flavors," but by not including the word "Flavors" after "Natural Whisky," purchasers who look closely will expect the distilled spirit of whisky was added as a separate ingredient.

46.   However, even where a distilled spirit is used to manufacture flavors, it loses its class and type when blended with other ingredients.

47.   Sources have confirmed that the amount of real whiskey in the Product is the equivalent of a thimble full per 2,500 gallons, less than a "drop in a bucket" in the malt beverage base.

48.   When viewed together with the Fireball distilled spirit brand name, the label misleads consumers into believing it is or contains distilled spirits.

49.   As a result of the false and misleading representations, the Product is sold at a premium price, $0.99 for 50 mL.

## Jurisdiction and Venue

50.   This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§ 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more putative Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiff and Defendant are citizens of different states. Further, greater than two-thirds of the of the class members reside is states other than the state in which Defendant is a citizen.

51.   This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

52.   Pursuant to 28 U.S.C. § 1391(b), venue is proper because Plaintiff reside in this District and purchased the Defendant's product in this District.

## Parties

53.   Plaintiff Alexhandyra is a citizen of Palm Beach County, Florida.

54.   Defendant Sazerac Company, Inc. is a New Orleans corporation with a principal place of business in Kentucky.

55.   Defendant manufactures and markets Fireball Cinnamon Whisky and Fireball Cinnamon.

56.   Defendant "saw an untapped market to provide [] product[s] that looked and smelled like a whiskey (or vodka, or Fireball) but wasn't actually a whiskey [vodka or Fireball] ... and would therefore would be legal to sell in a convenience store."

57.   Defendant first introduced its "gas station" liquor in Virginia, North Carolina, and South Carolina under unknown brand names.

58.   Defendant was prepared to market Fireball Cinnamon as Fireball Whiskey, based on its previous experience selling Flash Point Cinnamon, considered by customers to be a lower valued Fireball product.

59.   Defendant next rolled out this same "gas station" liquor but under the brand names of distilled spirit products.

60.   Purchasers of Fireball Cinnamon generally are disappointed that what they have bought and consumed is not Fireball Whisky nor does it contain any whiskey beyond a negligible amount.

15

61. Plaintiff purchased Fireball Cinnamon at gas station convenience stores and convenience stores near where she lives in Palm Beach County, Florida in 2022.

62. When she saw Fireball Cinnamon available, she did not hesitate to buy it, thinking it was the same Fireball Whiskey she had previously purchased at liquor stores.

63. Plaintiff decided to purchase Fireball Cinnamon at local gas station convenience stores because it was more convenient, because there were more of them than liquor stores, open longer hours, and she went there anyway to get gas for her car, among other things.

64. Plaintiff is like many consumers of alcoholic beverages who prefer distilled spirits or products containing distilled spirits to malt-based beverages.

65. Plaintiff saw the labeling elements of the Fireball Cinnamon and did not immediately notice the differences from the Fireball Whisky.

66. Plaintiff expected Fireball Cinnamon to be whisky and/or contain whisky in a non-de minimis amount.

67. Plaintiff paid more for the Product than she would have had she known the representations and omissions were false and misleading or would not have purchased it.

68. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

69. Plaintiff reserves the right to amend this Complaint to add different or

additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

## CLASS ACTION ALLEGATIONS

70. Plaintiff brings this action on behalf of herself and the following Classes pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and/or (b)(3). Specifically, the Classes are defined as:

**National Class:** All persons in the United States who purchased the Products during the fullest period of law.

In the alternative, Plaintiff brings this action on behalf of the following State Sub-Class:

**Florida Sub-Class:** All persons in the State of Florida who purchased the Products during the fullest period of law.

71. Excluded from the Classes are (a) any person who purchased the Products for resale and not for personal or household use, (b) any person who signed a release of any Defendant in exchange for consideration, (c) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, (d) any legal counsel or employee of legal counsel for any Defendant, and (e) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members.

72.   Plaintiff reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

73.   **Numerosity and Ascertainability:** Plaintiff does not know the exact number of members of the putative classes. Due to Plaintiff's initial investigation, however, Plaintiff is informed and believes that the total number of Class members is at least in the tens of thousands, and that members of the Class are numerous and geographically dispersed throughout the United States. While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, including Defendant's records, either manually or through computerized searches.

74.   **Typicality and Adequacy:** Plaintiff's claims are typical of those of the proposed Class, and Plaintiff will fairly and adequately represent and protect the interests of the proposed Class. Plaintiff does not have any interests that are antagonistic to those of the proposed Class. Plaintiff has retained counsel competent and experienced in the prosecution of this type of litigation.

75.   **Commonality:** The questions of law and fact common to the Class members, some of which are set out below, predominate over any questions affecting only individual Class members:

a. whether Defendant committed the conduct alleged herein;

b. whether Defendant's conduct constitutes the violations of laws alleged herein;

c. whether Defendant's labeling, sale and advertising set herein are unlawful, untrue, or are misleading, or reasonably likely to deceive;

d. whether the Products are adulterated and/or misbranded under the Florida Health & Safety Code and similar federal law;

e. whether Defendant knew or should have known that the representations were false or misleading;

f. whether Defendant knowingly concealed or misrepresented material facts for the purpose of inducing consumers into spending money on the Product;

g. whether Defendant's representations, concealments and non-disclosures concerning the Product are likely to deceive the consumer;

h. whether Defendant's representations, concealments and non-disclosures concerning the Product violate the common law;

i. whether Defendant should be permanently enjoined from making the claims at issue; and

j. whether Plaintiff and the Class are entitled to restitution and damages.

30. **Predominance and Superiority:** Common questions, some of which are set out above, predominate over any questions affecting only individual Class members. A class action is the superior method for the fair and just adjudication of this controversy. The expense and burden of individual suits makes it impossible and impracticable for members of the proposed Class to prosecute

their claims individually and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

     a.    given the complexity of issues involved in this action and the expense of litigating the claims, few, if any, Class members could afford to seek legal redress individually for the wrongs that Defendant committed against them, and absent Class members have no substantial interest in individually controlling the prosecution of individual actions;

     b.    when Defendant's liability has been adjudicated, claims of all Class members can be determined by the Court;

     c.    this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort and expense, and ensure uniformity of decisions; and

d.    without a class action, many Class members would continue to suffer injury, and Defendant's violations of law will continue without redress while Defendant continues to reap and retain the substantial proceeds of their wrongful conduct.

31.    **Manageability:** The trial and litigation of Plaintiff's and the proposed Class claims are manageable. Defendant has acted and refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

### FED. R. CIV. P. 9(b) ALLEGATIONS

32.    Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

33.    WHO: Defendant made material misrepresentations and/or omissions of fact in its labeling and marketing of the Products by representing that the Products are whisky when they are actually a flavored malt beverage.

34.    WHAT: Defendant's conduct here was and continues to be fraudulent because it has the effect of deceiving consumers into believing that the Products are whisky when they are actually a flavored malt beverage. Defendant omitted from Plaintiff and Class Members that the Products are not whisky but a flavored

malt beverage. Defendant knew or should have known this information is material to all reasonable consumers and impacts consumers' purchasing decisions. Yet, Defendant has and continue to represent that the Products are whisky when they are actually a flavored malt beverage and have omitted from the Products' labeling the fact they are not whisky but a flavored imitation.

35.    WHEN: Defendant made these material misrepresentations and/or omissions detailed herein, continuously throughout the applicable Class period(s).

36.    WHERE: Defendant's material misrepresentations and omissions, that were located on the very center of the front label of the Products in bold lettering, which instantly catches the eye of all reasonable consumers, including Plaintiff, at the point of sale in every transaction. The Products are sold numerous retail stores.

37.    HOW: Defendant made written misrepresentations on the front label of the Products. As such, Defendant's claims are false and misleading. Moreover, Defendant omitted from the Products' labeling the fact that the Product is not whisky but actually a flavored malt beverage. And as discussed in detail throughout this Complaint, Plaintiff and Class Members read and relied on Defendant's representations and omissions before purchasing the Products.

38.    WHY: Defendant misrepresented their Products and omitted from the Products' labeling the fact that they are not for the express purpose of inducing Plaintiff and Class Members to purchase the Products at a substantial price

premium. As such, Defendant profited by selling the misrepresented Products to at least thousands of consumers throughout the nation.

## COUNT I

### For Violations of Florida's Deceptive

### and Unfair Trade Practices Act,

### Fla. Stat. 501.201 et seq.

39.   Plaintiff realleges and incorporates by reference each of the allegations contained in paragraphs 1-48 above as if fully set forth herein.

40.   Plaintiff brings this claim on his own behalf and on behalf of each member of the Class.

41.   Defendant violated and continues to violate Florida's Deceptive and Unfair Trade Practices Act by engaging in unfair methods of competition, unconscionable acts and practices, and unfair and deceptive acts and practices in the conduct of their business.

42.   The material misstatements and omissions alleged herein constitute deceptive and unfair trade practices, in that they were intended to and did deceive Plaintiff and the general public into believing that Defendant's Products were whisky when they are actually a flavored malt beverage.

43.   Plaintiff and Class members relied upon these advertisements in deciding to purchase the Product.  Plaintiff's reliance was reasonable because of Defendant's reputation as a reliable company.

44.   Had Plaintiff known that the Product was not as advertised, he would not have purchased it. As a result of Defendant's deceptive and unfair acts, Plaintiff and Class members have been damaged.

45.   Defendant's conduct offends established public policy, and is immoral, unethical, oppressive, and unscrupulous to consumers.

46.   Plaintiff and Class members are entitled to damages in an amount to be proven at trial.

47.   Defendant should also be ordered to cease their deceptive advertising and should be made to engage in a corrective advertising campaign to inform consumers that its Product is not of the quality advertised.

## COUNT II

### For False and Misleading Advertising,

### Fla. Stat. § 817.41

48.   Plaintiff re-alleges and incorporates by reference the allegations of in the above-referenced paragraphs 1-48 of the Complaint as if fully set forth herein.

49.   Plaintiff brings this claim on his own behalf and on behalf of each member of the Class.

50.   On their website, in print advertisements, and in other forms of advertisements, Defendant made numerous misrepresentations of material fact regarding the quality of its Product.

51.   Defendant knew that these statements were false.

52.   Defendant intended for consumers to rely on its false statements for the purpose of selling its Product.

53.   Plaintiff and Class members did in fact rely upon these statements. Reliance was reasonable and justified because of Defendant's reputation as a reliable company.

54.   As a result of Defendant's misrepresentations, Plaintiff and Class members suffered damages in the amount paid for Defendant's Product

55.   Plaintiff and Class members are entitled to damages and injunctive relief as set forth above.

## COUNT III

## Fraud

## (On Behalf of the Nationwide Class)

56.   Plaintiff repeats and realleges the allegations in the previous paragraphs 1-48 as if fully set forth herein. Plaintiff brings this cause of action on behalf of herself and the Nationwide Class.

57.   As alleged herein, Defendant knowingly made material misrepresentations and omissions regarding the Products on the Products' labeling and packaging in the Products' advertisements, and/or on its website,

specifically the nail fungus treatment representations and omissions alleged more fully herein.

58.   Defendant made these material efficacy representations and omissions in order to induce Plaintiff and the putative Nationwide Class Members to purchase the Products.

59.   Defendant knew the representations and omissions regarding the Products were false and misleading but nevertheless made such representations through the marketing, advertising and on the Products' labeling.

60.   In reliance on these representations and omissions, Plaintiff and the putative Nationwide Class Members were induced to, and did, pay monies to purchase the Products.

61.   Had Plaintiff and the Nationwide Class known the truth about the Products, thet would not have purchased the Products.

62.   As a proximate result of the fraudulent conduct of Defendant, Plaintiff and the putative Nationwide Class paid monies to Defendant, through their regular retail sales channels, to which Defendant is not entitled, and have been damaged in an amount to be proven at trial.

## COUNT IV

### Unjust Enrichment

### (On Behalf of the Nationwide Class)

63.   Plaintiff re-alleges and incorporates by reference the allegations of in the above-referenced paragraphs 1-48 of the Complaint as if fully set forth herein.

64.   Plaintiff brings this cause of action on behalf of herself and on behalf of the Class.

65.   Plaintiff and Class members conferred a benefit on Defendant by purchasing the deceptively advertised Product at an inflated price.

66.   Defendant received the monies paid by Plaintiff and Class members and thus knew of the benefit conferred upon them.

67.   Defendant accepted and retained the benefit in the amount of the profits they earned from Defendant's Product sales paid by Plaintiff and Class members.

68.   Defendant has profited from their unlawful, unfair, misleading, and deceptive practices and advertising at the expense of Plaintiff and Class members, under circumstances in which it would be unjust for Defendant to be permitted to retain the benefit.

69.   Plaintiff does not have an adequate remedy at law against Defendant.

70.   Plaintiff and Class members are entitled to restitution of the amount paid for the Product and disgorgement of the profits Defendant derived from their deceptively advertised Product sales.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays this Court:

a.      Certify this action as a class action;

b.      Award compensatory, statutory, and punitive damages as to all Counts where such relief is permitted by law;

c.      Enjoin Defendant's conduct and order Defendant to engage in a corrective advertising and labeling/disclosure campaign;

d.      Award equitable monetary relief, including restitution;

e.      Award pre-judgment and post-judgment interest at the legal rate;

f.      Award Plaintiff and Class members the costs of this action, including reasonable attorneys' fees, costs, and expenses; and

g.      Award such other and further legal and equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


DATED:  June 5, 2023                    s/William C. Wright

                                        WILLIAM WRIGHT
                                        The Wright Law Office
                                        FL Bar No. 138861
                                        515 N. Flagler Drive, Suite P-300
                                        West Palm Beach, FL 33410
                                        Telephone: (561) 514-0904
                                        willwright@wrightlawoffice.com